IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| CAPTAIN CONNIE RHODES, M.D., | ) | Case No. 4:09-CV-106 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | September 14, 2009 |
| | ) | |
| THOMAS D. MACDONALD, ET AL., | ) | TRO HEARING |
| | ) | |
| Defendants. | ) | |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CLAY D. LAND

UNITED STATES DISTRICT JUDGE

Proceedings recorded by mechanical stenography; transcript produced by computer.

BETSY J. PETERSON, RPR, CCR
Federal Official Court Reporter
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFF:

 4

 5        ORLY TAITZ
          dr_taitz@yahoo.com
 6        Law Offices of Orly Taitz, Esq.
          26302 La Paz Suite 211
 7        Mission Viego, California  92691
          (949) 683-5411
 8

 9
     FOR THE DEFENDANTS:
10

11

          SHEETUL S. WALL
12        sheetul.s.wall@usdoj.gov
          Assistant U.S. Attorney
13        Middle District of Georgia
          1246 First Avenue
14        Post Office Box 2568
          Columbus, Georgia  31902-2568
15        (706) 649-7700

16        REBECCA ELAINE AUSPRUNG
          rebecca.ausprung@usarmy.mil
17        U.S. ARMY LITIGATION DIVISION
          901 N. Stuart Street, Suite 400
18        Arlington, Virginia  22203
          (703) 696-1614
19
          CAPTAIN ADAM KERSEY
20

21

22   COURT REPORTER:

23        BETSY J. PETERSON, RPR, CCR
          Federal Official Court Reporter
24        P. O. Box 81
          Columbus, GA 31902
25        (706) 317-3111
```

1                              INDEX

2

3                         EXAMINATION INDEX

4
  CONNIE MICHELLE RHODES, M.D.
5         BY THE COURT                              7
          BY MS. TAITZ                             15
6         BY CAPTAIN AUSPRUNG                       23
          BY MS. TAITZ                             24
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Proceedings on September 14, 2009, commencing at
 2        12:31 p.m., as follows:)
 3             THE COURT:  Please be seated.  Good afternoon.  This
 4   is in the case of Connie Rhodes versus Thomas D. MacDonald,
 5   Case 4:09-CV-106.  The plaintiff is represented by Ms. Orly
 6   Taitz, who is present.
 7             Ms. Taitz, I assume this is Captain Rhodes, your
 8   client, seated with you.  Is that correct?
 9             MS. TAITZ:  Yes, that's right.
10             THE COURT:  The defendant is represented by Assistant
11   U.S. -- defendants are represented by Assistant U.S. Attorney
12   Sheetul Wall.
13             MS. WALL:  Yes, Your Honor.
14             THE COURT:  Along with Major Ausprung and Captain
15   Kersey.
16             MS. AUSPRUNG:  Yes, Your Honor.
17             THE COURT:  All right.  Ms. Taitz, you have the
18   burden with regard to the request for a temporary restraining
19   order.  Do you wish to put up any evidence beyond what you have
20   already submitted in the form of affidavits, or do you wish to
21   rely solely upon the affidavits?
22             MS. TAITZ:  I will proceed upon evidence that was
23   already submitted to court.
24             THE COURT:  You don't have any testimony that you
25   wish to present; is that correct?
```

 1          MS. TAITZ:  Unless you have any specific questions to

 2   Captain Rhodes.  She does have a concern.  She was warned that

 3   if she provides testimony it might be used by JAG to punish her

 4   in any way, and that is the concern that she has.  She would be

 5   happy to testify, but that is the concern.

 6          And as a matter of fact, I wanted to clear up one

 7   more point.  As we were here on Friday, I presented the

 8   statement, notarized statement, by Captain Rhodes.  And the

 9   attorneys for the defendants stated that that was not true,

10   that she simply wasn't willing to be here in court.  And what

11   Captain Rhodes would like to submit to Court is the fact that,

12   indeed, on Friday, at four o'clock, central time, she was at

13   this meeting with her commander, Colonel Jeffrey Johnson, as

14   she stated.  And moreover, she would be willing to provide her

15   cell phone and she would sign release.

16          THE COURT:  Well, I would like to hear from Captain

17   Rhodes rather than you telling me what you think she's going to

18   say.

19          Captain Rhodes, come to the witness stand, please,

20   straight ahead.  Stop right there for a moment, raise your

21   right hand, and take the oath.

22          CONNIE MICHELLE RHODES, M.D., PLAINTIFF, SWORN

23          THE WITNESS:  I affirm so, sir.

24          THE COURT:  She affirms the oath.  Please be seated.

25          MS. AUSPRUNG:  Is it possible to have a side bar

1   before Captain Rhodes testifies?

2           THE COURT:  For what purpose?

3           MS. AUSPRUNG:  Just to discuss something that may be

4   pertinent to Your Honor's knowledge before questioning her

5   regarding her presence here on Friday.  If you intend to

6   question her on that matter.  If you don't, then we can move

7   on.

8           THE COURT:  We'll see.

9           MS. AUSPRUNG:  Yes, Your Honor.

10          THE COURT:  If you want to put something on the

11  record to set the record straight from your perspective, then

12  I'll let you do that.

13          MS. AUSPRUNG:  All right.  Your Honor.

14          THE COURT:  Do you want to go ahead and do it now?

15          MS. AUSPRUNG:  I would just like to let you know that

16  the information we had on Friday that we conveyed to you, that

17  Captain Rhodes did not want to attend the hearing, was accurate

18  as of the time that we presented it, and we obtained it on

19  Thursday.  However, subsequent to that, while I was traveling,

20  we did find out after the hearing that Captain Rhodes had in

21  fact made a request to attend the hearing this day, and there

22  was a misunderstanding from her chain of command based upon her

23  earlier statement that the lawsuit would proceed in her

24  absence.  They did not realize that she was required to be

25  here, so they denied that request for leave, because she had a

1   meeting with her commander scheduled for 4 p.m. on Friday.  So

2   we don't want any implication that she was lying in that

3   regard.

4          THE COURT:  The record is clear to the Court that

5   Ms. Rhodes was unable to be here on Friday through no fault of

6   her own.

7                     EXAMINATION

8   BY THE COURT:

9   Q.  Captain Rhodes, state your name, please.

10  A.  That's Connie Michelle Rhodes, sir.

11  Q.  And you are the plaintiff in this case?

12  A.  Yes, sir.

13  Q.  I want to just get some clarification on a few thing that

14  were not clear to me from the complaint.  When did you first

15  enter the military?

16  A.  I originally commissioned approximately March of 2005 and

17  went active duty approximately June 18 of 2007.

18  Q.  So when you say you were commissioned in March of 2005,

19  were you commissioned as an officer at that time?

20  A.  Yes, sir.

21  Q.  And what was your rank at that time?

22  A.  You go in as a lieutenant, sir.

23  Q.  And then you went from lieutenant to active duty on June --

24  in June of 2007?

25  A.  Yes, sir.

1    Q.  So what happened between March of 2005 and June of 2007?

2    A.  I graduated medical school.

3    Q.  Okay.  So you graduated medical school when?

4    A.  It was May of 2007.

5    Q.  Okay.  And you started medical school when?

6    A.  Approximately it was either 2001, 2002, because I took a

7    one-year leave of absence.

8    Q.  Okay.  And did you receive your medical training at the

9    expense of the government based upon you subsequently agreeing

10   to serve in the Army as a medical doctor?

11   A.  Partly, sir.  My third and fourth year were covered through

12   the scholarship.

13   Q.  And what commitment did you have to make to the Army for

14   them paying for your third and fourth year of medical school?

15   A.  After completing military internship which, when you apply,

16   you are required to apply to military programs; and if you are

17   picked up, you have to take that.  After completing the

18   internship, then it was an additional one year for one year.

19   So it ends up being two years.  And the active duty service

20   obligation was to complete July 1st of 2010, sir.

21   Q.  So you were commissioned in March of '05, and that would

22   have been -- you would have been starting your third year of

23   medical school.

24   A.  I would be getting ready to start the third year that fall,

25   yes, sir.

1   Q.  So for your third year and your fourth year, the Army paid

2   your tuition and what else?  Living expenses?

3   A.  There's a stipend that's also given, sir.

4   Q.  Okay.  And then when you completed medical school in June

5   of 2007, you became active duty.

6   A.  Yes, sir.

7   Q.  And that's when you started your internships?

8   A.  Yes, sir.

9   Q.  At Army facilities.

10  A.  Yes, sir.

11  Q.  And you completed those internships when?

12  A.  I completed the first year of a general surgery internship

13  the following summer, so it would have been July of 2008.

14  Q.  And upon the completion of your internship, that's when

15  your two-year commitment began?

16  A.  Yes, sir.

17  Q.  So you committed to serve as an Army doctor until July of

18  2010?

19  A.  Yes, sir.

20  Q.  And subsequent to your -- where did you go to medical

21  school?

22  A.  University of Illinois, at Urbana Champagne.

23  Q.  And subsequent to graduating from medical school, during

24  your internships, where have you been stationed?

25  A.  My internship was at Eisenhower Army Medical Center.  Upon

1  completion of that, I worked at the Troop Medical Center there

2  at Fort Gordon for a short time prior to --

3  Q.  Where is Fort Gordon?

4  A.  It's where Eisenhower Army Medical Center is.  It's in

5  Augusta, Georgia, sir.

6      After that, I went to -- I was sent to the flight surgeon

7  course at Fort Rucker Alabama, and then I was transferred to

8  Fort Riley, Kansas, sir.

9  Q.  And have you been doing your -- after you completed the

10 internship, which would have been June of 2007, have you been

11 at Fort Riley since that time?

12 A.  I went to Fort Riley -- I believe my report date was

13 November of this past year.

14 Q.  Let me correct that.  You actually you started -- you

15 completed your internship in July of '08; correct?

16 A.  Correct.

17 Q.  So where did you -- did you go to Fort Riley in July of

18 '08?

19 A.  No, sir.  I went to Fort Rucker, I believe it was, October

20 of that year.  Completed the flight surgeon course.  And upon

21 completion of that, I went to Fort Riley, which was November of

22 this last year.

23 Q.  So you have been in Fort -- at Fort Riley, Kansas, since

24 November of '08.

25 A.  Yes, sir.

1  Q.  And you haven't been deployed overseas at all.

2  A.  No, sir.

3  Q.  And was there any commitment made to you as to whether or

4  not during your two-year commitment you would or would not be

5  deployed overseas?

6  A.  No commitment was made, sir.

7  Q.  You understood that was a possibility?

8  A.  Yes, sir.

9  Q.  And when you accepted the benefits from the Army, you

10  agreed at that time that if they deployed you overseas, you

11  would go; correct?

12  A.  Yes, sir.  I will follow orders.

13  Q.  And in fact, your objection today is not to the fact that

14  you have been deployed overseas; is that true?

15  A.  That is true, sir.

16  Q.  And is your deployment to Iraq or Afghanistan?

17  A.  It is to Iraq, sir.

18  Q.  Your current objection to that deployment is based solely

19  upon your concerns over the legitimacy of the current commander

20  in chief; is that correct?

21  A.  My concern is that I am following a lawful order, sir.

22  Q.  Well, I just want to get it boiled down to what it's really

23  all about.

24      You have concerns as to whether your current deployment

25  order is lawful based upon who is presently commander in chief;

1    is that correct?

2    A.  Yes, sir.

3    Q.  So, for example, hypothetically, if Senator McCain had won

4    the election and were president and commander in chief, you

5    would have no objection to being deployed to Iraq; is that

6    true?

7    A.  If there was not a question that existed regarding his

8    citizenship.

9    Q.  Let me make it easier, maybe.

10   A.  Yes, sir.

11   Q.  If our former commander in chief, President Bush, were

12   still the president of the United States, do you know of any

13   reason that you would have any objection to being deployed to

14   Iraq?

15   A.  No, sir.

16   Q.  So you are not fearful of going to Iraq.

17   A.  No more than normal, sir.

18   Q.  And you understand that was part of your commitment.

19   A.  Yes, sir.

20   Q.  The concern with going is, you do not feel that the current

21   commander in chief is eligible to hold that office.

22   A.  I would like to confirm that that is the case to ensure

23   that I'm following a lawful order, just because of, from what I

24   understand, some of the secondary fall-out that potentially

25   there is.

1  Q.  You are not seeking a discharge from the Army, are you?

2  A.  No, sir.

3  Q.  And you are not seeking to avoid your two-year commitment,

4  are you?

5  A.  No, sir.

6  Q.  When you were deployed to Fort Riley in November of '08,

7  you had no objection to that; correct?

8  A.  Correct, sir.

9  Q.  And you have received orders since January of 2009 from

10  your chain of command; correct?

11  A.  Yes, sir.

12  Q.  You have followed those orders, have you not?

13  A.  Yes, sir.

14  Q.  Have you filed any litigation expressing your concerns over

15  those orders that you received while you were in Fort Riley,

16  Kansas?

17  A.  No, sir.  The orders I received -- for example, I was sent

18  to officer basic in San Antonio, which is a requirement of all

19  officers and such.

20  Q.  When did you receive that order?

21  A.  I believe it was January or February, because I left in

22  March.

23  Q.  Of 2009?

24  A.  Yes, sir.

25  Q.  Did you have the belief at that time that there was a

1   question about the eligibility of the current commander in

2   chief at that time to hold that office?

3   A.   I hadn't thought about it in that respect.  The concern

4   came up when my understanding is the protection you have from

5   the Geneva Convention, if it's under an unlawful order, then

6   there's potentially some loss of protection.  And in San

7   Antonio, for example, that's less of an issue as it would be in

8   Iraq, sir.

9   Q.   So you have had no concerns about following orders from

10  your chain of command as long as you remained on United States

11  soil; is that correct?

12  A.   As long as I'm protected, so to speak, yes, sir.

13  Q.   Well, you have felt sufficiently protected while you were

14  in the United States; is that correct?

15  A.   Correct, sir.

16  Q.   So you have no concerns about following orders as long as

17  you remain physically in the United States; is that true?

18  A.   I believe it suggests an intent that isn't necessarily

19  there.  But, yes, sir, in fact, yes.

20  Q.   Your objection is being deployed overseas as long as there

21  is this, quote, alleged cloud on the eligibility of the current

22  commander in chief; is that correct?

23  A.   Yes, sir, because we do lose Geneva Convention protection,

24  from what I understand, sir.

25  Q.   Prior to filing this lawsuit, did you make any complaints

1    within your chain of command about your concerns of the

2    eligibility of the President to be president and commander in

3    chief?

4    A.  No, sir.

5          THE COURT:  All right.  I think she's answered the

6    questions that I wanted clarification on.

7          Does the -- Ms. Taitz, do you want to ask her any

8    follow-up questions?

9          MS. TAITZ:  Absolutely.

10                         EXAMINATION

11   BY MS. TAITZ:

12   Q.  So I just wanted you to clarify for the Court.  This action

13   has nothing to do with your obligations to repay the military

14   and serve.

15   A.  Correct.

16   Q.  You are willing to serve.  You are willing to serve in

17   Iraq.

18   A.  Correct.

19   Q.  Whatever you need to do.

20   A.  Yes, ma'am.

21   Q.  You have mentioned that your concern started when you

22   worked as a doctor in Chicago.  Right?

23   A.  When I was a medical student in Illinois.

24   Q.  In Illinois.

25   A.  Yes, ma'am.

1   Q.   Where Mr. Obama was a senator.

2   A.   At the time there was question even then, yes, ma'am.

3   Q.   Can you provide for the Court your knowledge, your

4   professional knowledge as a doctor, what was the concern, in

5   your opinion, and what did you observe?

6   A.   Are you asking in regards --

7   Q.   In regards to Mr. Obama and his qualifications.

8   A.   Typically, when there is a child born, you have a birth

9   certificate that's provided.  It has a location.  It has an

10  attending physician, time, date, even sometimes a footprint,

11  and that sort of thing.  And I just -- I guess I don't

12  understand, since it's so common, why the production of those

13  documents is -- has become such a difficult thing to occur.

14  Q.   So you believe that if Mr. Obama would be legitimate as --

15  and what he is saying would be true -- he would have just

16  provided that hospital birth certificate with the name of the

17  doctor.

18  A.   I'm simply asking for the clarification of such.

19  Q.   And you see, as a doctor in a hospital in Chicago -- first

20  medical student, then doctor -- have you seen a number of such

21  birth certificates?

22  A.   I have seen a few, yes, ma'am.

23  Q.   Did those have the name of the hospital?

24  A.   Yes, ma'am.

25  Q.   Did those have the name of the attending physician, like

1  you?

2  A.  Typically, yes, ma'am.

3  Q.  And they would have other signatures.

4  A.  Typically, yes, ma'am.

5  Q.  Have you seen what Mr. Obama posted on the Internet?

6  A.  That he personally has, not specifically.  I have seen

7  copies.

8  Q.  Yeah.  Copy, I meant.  Of course, nobody has seen the

9  original.

10  A.  Yes, ma'am.

11  Q.  And did it have the name of any specific hospital?

12  A.  I have not seen that personally.

13  Q.  Did you see any names of any doctors?

14  A.  I have not seen that personally.

15  Q.  Any signatures?

16  A.  I have not seen that personally.

17  Q.  Now, have you seen what I have provided just recently to

18  this court and in a previous case in California, the

19  declaration of Mr. Smith and the birth certificate from Kenya?

20  A.  I know of it.  I haven't personally seen it.

21  Q.  But you are aware of it.

22  A.  Yes, ma'am.

23  Q.  That it was a hospital birth certificate with the --

24  A.  Yes, ma'am.

25          MS. AUSPRUNG:  Objection, Your Honor.  The witness --

```
 1              THE COURT:  Sustained.  Sustained.
 2              You don't have any idea whether or not this document
 3    that suggests that President Obama was born overseas, whether
 4    that's an authentic, legitimate document; you have got no idea,
 5    do you?
 6              THE WITNESS:  Correct.
 7              THE COURT:  You have no idea.
 8              THE WITNESS:  Correct, sir.
 9    BY MS. TAITZ:
10    Q.  Would you like the court to request such authentication?
11    A.  Yes, ma'am.
12    Q.  So if Your Honor were to request such authentication from
13    the government of Kenya or from the State Department, that
14    would be sufficient to resolve the matter.
15    A.  Yes, ma'am.
16    Q.  I have another question.  As a medical doctor, you are
17    supposed to give vaccinations to the military personnel.
18    A.  Correct.
19    Q.  And are those vaccinations indeed mandatory?
20    A.  Yes, ma'am.
21    Q.  You have to give them.
22              Have you heard, or are you aware, of the problem with such
23    vaccinations and specific vaccines having live virus?
24    A.  Yes, ma'am.
25              MS. AUSPRUNG:  Objection, Your Honor.  This is not
```

1    relevant to this proceeding, and it's hearsay.

2            MS. TAITZ:  Would you like to explain to Your Honor

3    how you are aware of this and why is it relevant?

4            THE COURT:  How is this relevant?

5            MS. TAITZ:  Your Honor, one of -- we have to

6    explain -- for the TRO hearing, we need to show that if indeed

7    harm is being done to the plaintiff and whether this harm

8    outweighs the harm to the defendants.  It was reported in

9    Canada free press, in European press, and as a matter of

10   fact --

11           THE COURT:  Well, she needs to testify based upon her

12   personal knowledge and expertise and not what she's read with

13   regard to some Canadian press.

14           MS. TAITZ:  Well, as a medical doctor, she reads

15   medical publications.

16   BY MS. TAITZ:

17   Q.  Dr. Rhodes, have you seen any publications relating to

18   medicine that you in your experience has read about those

19   vaccines?

20   A.  I have seen editorials in journals regarding the concern of

21   the quickness of the vaccination process.

22           THE COURT:  So you're concerned about the vaccines

23   that you will have to receive before you are deployed

24   overseas?

25           THE WITNESS:  Sir, I have already received my

1    vaccines.

2    BY MS. TAITZ:

3    Q.  But you as a doctor will have to give vaccines to people,

4    and there is a concern that, just like some of those vaccines

5    sent to Europe had live virus, other vaccines might have live

6    virus as well.

7    A.  I'm certainly required to give vaccines, yes, ma'am.

8    Q.  Do you have a concern that this might happen again?

9    A.  Of course.

10            THE COURT:  Concerns when you get overseas?

11            THE WITNESS:  Concerns either here or overseas, but

12    yes, sir.

13            THE COURT:  I'm not following this entire line of

14    inquiry.

15            You have no problem with following the orders, even

16    with the present commander in chief, if you are on American

17    soil, so how is the giving of vaccines in the United States a

18    concern of yours that you wouldn't have -- that you would not

19    otherwise have if you were being deployed?  I'm not following

20    this.

21            THE WITNESS:  I'm simply answering the questions

22    asked.

23            THE COURT:  I understand.  Maybe you are not

24    following at what your attorney is getting at.  Do you want

25    what she's getting at?

```
 1            THE WITNESS:  I'm not a hundred percent, sir.
 2            THE COURT:  Let's move on to something else.
 3  BY MS. TAITZ:
 4  Q.  Have you heard -- are you familiar with the Tuskegee
 5  Experiment?
 6  A.  Yes, ma'am.
 7            THE COURT:  We're not -- the vaccines has got nothing
 8  to do with this case.  Let's move on to another subject matter.
 9  BY MS. TAITZ:
10  Q.  You have mentioned that you are concerned about protection
11  of Geneva Convention when you are deployed overseas if you are
12  not following lawful orders.
13  A.  Yes, ma'am.
14  Q.  What would be the consequences for you if indeed you are
15  captured and you don't have the protection of Geneva
16  convention?
17  A.  My understanding -- I don't have the Geneva Convention
18  specifications in front of me, but my understanding is that if
19  you are not following a lawful order, you are not afforded
20  convention protections, which includes basically what I
21  understand is a bill of rights of sorts, as a prisoner, for
22  example.
23  Q.  Have you heard of American servicemen being beheaded in
24  Iraq?
25  A.  Yes, ma'am.
```

1   Q.  So if you don't have such protection, you can be beheaded.

2   A.  In theory, yes, ma'am.

3   Q.  Have you heard of instances where --

4           MS. AUSPRUNG:  Objection, Your Honor.  This line of

5   questioning is also not relevant to these proceedings.

6           THE COURT:  Sustained.  She said that -- she said

7   that she is concerned about going over there with the present

8   commander in chief as president because she thinks that she may

9   lose some of her Geneva protection rights.  That's her

10  contention.  She's said that.  I don't think she can add

11  anything to it.

12  BY MS. TAITZ:

13  Q.  So --

14          THE COURT:  Go on to something else.  Let's go on to

15  something else.

16  Q.  So I'm nearly done here.

17      Just to wrap it up.  When you signed up for military

18  service, Mr. Obama was not the President; right?

19  A.  Correct, ma'am.

20  Q.  And from January 9th, when he became the President, this is

21  the first time where you have an order that would significantly

22  change your life, that would significantly impact your life;

23  right?

24  A.  Yes, ma'am.

25  Q.  And you weren't here on Friday, but -- and probably haven't

1    seen the pleadings -- but the military has concern that if now

2    you would be granted temporary restraining order, in future,

3    each and every order that somebody doesn't like would end up in

4    court and that would affect the military.

5        So in your case, you are not objecting to each and every

6    order; you are objecting just to one order that can

7    potentially -- that would harm your life or would have a grave

8    impact on your life.

9    A.  I'm seeking clarification on the order, ma'am.

10            MS. TAITZ:  Okay.  That's it.

11            THE COURT:  All right.  Ms. Ausprung, do you have any

12   questions you would like to ask this witness?

13            MS. AUSPRUNG:  Just a few questions, Your Honor.

14                        EXAMINATION

15   BY CAPTAIN AUSPRUNG:

16   Q.  Captain Rhodes, when you are deployed over in Iraq, you are

17   going to be serving as a medical doctor?

18   A.  Yes, ma'am.

19   Q.  And you are going to be caring for sick and injured

20   soldiers.

21   A.  Among others, yes, ma'am.

22   Q.  And you have no projection right now to be performing

23   combat duties.

24   A.  No projection at this time.  However, it is my

25   understanding -- I mean, it is a war zone and there's always

1  that possibility.

2  Q.  Well, you seem to be pretty familiar with the Geneva

3  Conventions.  I assume that you are aware that, under the

4  Geneva Conventions, you are considered a noncombatant as a

5  medical doctor.

6  A.  Yes, ma'am.

7  Q.  So you would be a noncombatant and unable to perform any

8  combat duties; correct?

9  A.  Correct, ma'am.

10          MS. AUSPRUNG:  Thank you.

11          MS. TAITZ:  If I might redirect, specifically in

12  regards to those questions.

13                              EXAMINATION

14  BY MS. TAITZ:

15  Q.  Ms. Ausprung has mentioned that possibility of Dr. Rhodes

16  being beheaded was improper line of questioning.  Now, if she

17  is not a combatant but a medical doctor -- if you are captured,

18  even if you are not combatant, if you are captured, can you be

19  beheaded as --

20  A.  In theory, yes.

21  Q.  There was --

22          MS. AUSPRUNG:  Your Honor, this line --

23          THE COURT:  Sustained.

24  BY MS. TAITZ:

25  Q.  There was --

1          THE COURT:  I assume the objection was irrelevant?

2          MS. AUSPRUNG:  Yes, Your Honor.

3          THE COURT:  All right.  Let me just make sure that I

4    understand this.

5          If a medical doctor goes to Iraq, as a medical

6    doctor, and not to serve in the combat zone, and they are

7    therefore designated as a noncombatant, if some terrorist in

8    Iraq were to capture that doctor and behead them, that would be

9    a violation of the Geneva Convention regardless of who's

10   president; correct?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  So the concern about being beheaded as a

13   noncombatant medical doctor exists whether the President is

14   Obama, Bush, Reagan, or George Washington; correct?

15         THE WITNESS:  Correct, sir.

16         THE COURT:  Let's go on to something else.

17   BY MS. TAITZ:

18   Q.  I'll just ask one follow-up question.

19       Have you heard of increased number of death just recently

20   in Afghanistan?

21   A.  Yes.

22         THE COURT:  That's hearsay.

23   Q.  Okay.  As a military officer, do you receive information in

24   regards -- through the military, in regards to the deaths in

25   Afghanistan?

```
 1          MS. AUSPRUNG:  Objection.  Your Honor, that's still
 2   hearsay and it's irrelevant.
 3          THE COURT:  Ms. Taitz, I think the Court can accept
 4   the fact that being deployed to Iraq, not Afghanistan --
 5          THE WITNESS:  Correct, sir.
 6          THE COURT:  -- but either -- is dangerous.  The
 7   question is not whether it's a dangerous place.  The question
 8   is how that relates to her claim that it's somehow denying her
 9   her Constitutional rights to be deployed there under the
10   current commander in chief.
11          MS. TAITZ:  If --
12          THE COURT:  So all this testimony about how dangerous
13   it is, is not directly relevant to her claim.
14          MS. TAITZ:  Well, Ms. --
15          THE COURT:  So ask her questions that are relevant.
16          MS. TAITZ:  Well, if there are many more people dying
17   under the rule of Mr. Obama, then her chances of being killed
18   are just skyrocketed, because the president is Mr. Obama.  And
19   specific policy --
20          THE COURT:  I have seen no evidence in the record in
21   this case that there have been any more servicemen killed in
22   Iraq during President Obama's presidency than under President
23   Bush's presidency.  I'm not saying it is or it isn't.  I'm just
24   saying there is no evidence in the record in this case to that
25   effect.  So let's move on to something that is relevant and
```

1   that is substantiated by the record in this case.

2          MS. TAITZ:  I think at this point I will just argue

3   my point for the TRO.

4          THE COURT:  Any further questions?

5          MS. AUSPRUNG:   No, Your Honor.

6          THE COURT:  You may step down.

7          All right.  All of the evidence is in with regard to

8   the motion for a temporary restraining order.

9          Ms. Taitz, I'll let you present your argument.

10         MS. TAITZ:  May I be seated?

11         THE COURT:  If you feel comfortable doing that, you

12  can do it from your seat, yes, ma'am.  Just make sure you speak

13  into the microphone.

14         MS. TAITZ:  Sure.

15         Your Honor, in order to grant TRO, one has to provide

16  explanation on several points:  first, likelihood of success on

17  the merits; two, harm to the plaintiff and whether this harm

18  outweighs the harm to the defendants and how does it affect the

19  public policy.

20         And I submit to you, Your Honor, that, in light of

21  the fact that Mr. Obama has never provided any, any of his

22  vital records, and now we have received a declaration, under

23  penalty of perjury, that is part of the record in this case,

24  together with Mr. Obama's birth certificate from Kenya,

25  shows --

1              THE COURT:  Explain to me the procedure that you

2   contend you have followed in authenticating this document that

3   you suggest is his actual birth certificate from the records in

4   Kenya.

5              MS. TAITZ:  Well --

6              THE COURT:  I have seen the document and, you know,

7   it's got a name, Barack Obama, II, or something to that effect;

8   and then it purports to list his parents; and then it purports

9   to have a baby's footprint.  But what have you done in the

10  record here to establish the authenticity of that such that the

11  Court should even consider it?

12             MS. TAITZ:  Well --

13             THE COURT:  You have got -- as I understand it, you

14  have got an affidavit from some individual, who is not

15  affiliated in any way with the Kenyan authorities, who claims

16  that he went into the office over there in Kenya and told them

17  that he wanted this birth certificate, and they gave it to

18  him.  Is that the essence of how you are attempting to

19  authenticate that as a document that can be considered by a

20  court of law?

21             MS. TAITZ:  Your Honor, if you would give me a

22  minute, I would be happy to explain.

23             THE COURT:  Explain.  That's my understanding of what

24  you are doing.  If my understanding is incorrect, having --

25  because I have read all the papers.

1          MS. TAITZ:  Yeah.

2          THE COURT:  If my understanding is incorrect, then

3    tell me what's incorrect about it.

4          MS. TAITZ:  I'll be happy if you'll give me a minute

5    to explain my point.

6          THE COURT:  Explain to me whether I'm understanding

7    what you are trying to do correctly.

8          MS. TAITZ:  Yes.  It's incorrect.

9          THE COURT:  Okay.  Tell me how.

10          MS. TAITZ:  First of all, and the main point is that

11    nobody has ever authenticated what Mr. Obama posted on the

12    Internet in saying --

13          THE COURT:  No, no.  That's not my question.  You

14    understand, this is a court of law --

15          MS. TAITZ:  Yes, sir.

16          THE COURT:  -- where the Court has to follow certain

17    Federal Rules of Evidence.

18          MS. TAITZ:  Okay.

19          THE COURT:  And you understand that one of the

20    Federal Rules of Evidence is that for a court to consider a

21    document as documentary evidence in a court of law -- I'm not

22    talking about at a press conference or on a TV show or in a Fox

23    and Friends.  I'm talking about, in a court of law, the judge

24    has to determine whether there's been sufficient foundation

25    laid as to authenticity to consider a document that's admitted

1    into evidence.

2         Tell me what it is that you've done to establish the

3    evidentiary foundation for this Kenyan document.

4         My understanding of what you have done is, you have

5    got an individual who went and got this piece of paper, who

6    says he got it from this office in Kenya, and he says they gave

7    it to him as this birth certificate.  There's no official --

8         MS. TAITZ:  Your Honor --

9         THE COURT:  -- in Kenya that signed any authenticity

10   certificate.

11        MS. TAITZ:  Your Honor --

12        THE COURT:  Is that true?  Am I correct in reading

13   your papers?

14        MS. TAITZ:  Your Honor, if you will give me a minute

15   to explain, I will.  But you are not giving me --

16        THE COURT:  Because whenever I give you a minute, you

17   want to go off into these talking points about something else.

18        I want to focus in directly about what you have done,

19   under the Federal Rules of Evidence, to authenticate this

20   document.  What is it that makes it --

21        MS. TAITZ:  Your Honor --

22        THE COURT:  -- admissible?

23        MS. TAITZ:  If you can give me a minute, again, I

24   will explain.

25        As Dr. Rhodes explained, we have not seen Mr. Obama's

1    hospital birth certificate from --

2              THE COURT:  That's not my question.  That is not my

3    question.

4              My question is focused solely at this point on the

5    document that you produced that you claim came from Kenya.

6    That's the document that I want to focus on now.

7              MS. TAITZ:  This document is consistent with the

8    registrar birth certificate that was obtained from Kenya.  I

9    have --

10             THE COURT:  What do you mean, "consistent with"?

11             MS. TAITZ:  All of the information is the same in the

12   registrar birth certificate from Kenya and the hospital birth

13   certificate.  I went --

14             THE COURT:  Have you produced in this case a copy of

15   the document you contend is the hospital birth certificate?

16             MS. TAITZ:  Your Honor, if you decided for yourself

17   that you will not let me speak and you will not grant us TRO,

18   then we're just wasting time.

19             THE COURT:  Let me make it clear to you, Ms. Taitz.

20   This is not a forum to give speeches.  This is not a forum to

21   lay the foundation for a press conference.  This is a court of

22   law where we follow certain rules.  One of those rules is that

23   in order to have evidence considered by a court, you must

24   follow the Federal Rules of Evidence.

25             I have asked you on more than one occasion to show

1   for me how you have established the authenticity of the

2   document that you contend came from Kenya.  That's what I'm

3   interested in at the present time.  I'll let you complete your

4   argument.  But at this time you rely upon that heavily; and

5   therefore, I want you to tell me, under the rules of law, how

6   you have established its authenticity.

7            MS. TAITZ:  I have gone to the consulate of Kenya,

8   and I have talked to the acting counsel, who has stated that he

9   does not have authority to authenticate the document; and

10  therefore, I'm asking for the TRO and discovery.  I'm asking

11  you to give me 60 days and discovery, whereby I can go to and

12  send letters interrogatory to Kenya and to the health

13  department in Hawaii and to Mr. Obama.

14           You have nothing, Your Honor.  How can you attack me

15  and saying that I did not obtain proper authentication, when

16  you are not saying a word to those three attorneys that

17  provided zero authentication of some piece of garbage that

18  Mr. Obama posted on the Internet and wants the whole country to

19  consider as a document.  It was never authenticated by

20  anybody.  Nobody said that this piece of garbage is a document.

21           THE COURT:  Ma'am, how did you obtain the document

22  that you claim comes from Kenya?

23           MS. TAITZ:  The person who has submitted this

24  document has --

25           THE COURT:  No.  You submitted it in this court.

```
 1              MS. TAITZ:  Yes.
 2              THE COURT:  And therefore, you have made the
 3    representation, under Rule 11 that we practice under, that you
 4    have made some investigation --
 5              MS. TAITZ:  Yes, I did.
 6              THE COURT:  -- that this is a legitimate piece of
 7    evidence.
 8              MS. TAITZ:  Yes.
 9              THE COURT:  How did you obtain the document from
10    Kenya?
11              MS. TAITZ:  The person that obtained this document is
12    currently in my office.  He is actually currently at the
13    meeting with the -- with two of my assistants, with two U.S.
14    Attorneys in Los Angeles, California.  I observed the document,
15    the original, that's in his possession.  It looks authentic.
16    However, until I have a court order from you, Your Honor, to
17    the government of Kenya to authenticate, I cannot do it.  I
18    attempted to do so.  I went to the consulate of Kenya, and I
19    was told that they cannot just authenticate.  The only way I
20    can do it, if you, Your Honor, will give me a letter
21    interrogatory and give my client 60 days' reprieve so that I
22    can go with this letter interrogatory to the consulate or
23    embassy of Kenya who --
24              THE COURT:  Is the person that obtained the document
25    that you have filed with the court an employee of yours?
```

1          MS. TAITZ:  He is not my employee.  He is a witness.

2          THE COURT:  He went over there.  And how did he get

3    it?

4          MS. TAITZ:  He went to the hospital.  And, as you

5    know, this hospital, Host General Hospital, in Mombasa, is the

6    only hospital that is protected by the military.  Any other

7    hospital, you can just go in and out, no problem.  This

8    particular hospital, according to the document Mr. Obama was

9    born, is protected by the military; and he had to pay a

10   financial consideration in order to go in and in order to get

11   the documents.  And he has stated that he has given the

12   administrator 20 minutes.  He said, Look, if within 20 minutes

13   I can get this document, this is the consideration that I'm

14   willing to pay.  So he stated that this is something that could

15   not have been forged, because there was so little time to forge

16   anything.  And that's --

17         THE COURT:  Let me make sure I understand this.

18         So this is a United States citizen that went over

19   there.

20         MS. TAITZ:  Yes.

21         THE COURT:  And this hospital, under their rules and

22   regulations and the applicable law, would not allow him to come

23   into that hospital and review their medical and birth records.

24         MS. TAITZ:  Not because of rules or regulations but

25   because Mr. Obama's cousin, Raila Odinga, is the Prime Minister

1    of Kenya.  That is the reason why that hospital is specifically

2    protected.

3              THE COURT:  Well, if you sent this same person to a

4    hospital here in Columbus, and he said, "I would like to go

5    through your birth records," you don't think that person would

6    be authorized to do that, do you, in the United States?

7              MS. TAITZ:  Well, let me tell you --

8              THE COURT:  It's a rhetorical question.  You don't

9    have to answer it.

10             But I want to make sure I understand this, because

11   you have left the impression with me that this witness you have

12   bribed an official in Kenya in order to obtain this document

13   that you have submitted as evidence in this court.

14             Now, if you did not intend to leave that impression,

15   I will let you clarify that.  But as I understood what you just

16   said, the person otherwise did not have access to these

17   hospital records; and he had to pay somebody in order to get

18   access that he otherwise did not have; and upon paying that

19   person, he therefore got this document.  That sounds to me like

20   a bribe.

21             If that's not the impression that you tried to leave,

22   then I'll let you straighten that out on the record.

23             MS. TAITZ:  I would like to straighten it out.

24             To me, the fact that our judiciary, when, after a

25   hundred lawsuits were filed, and our judiciary, in many cases,

1   and our U.S. Attorney and JAG, are unwilling to provide the

2   citizens of this country with documents that shows --

3          THE COURT:  No, ma'am.  That's just another speech.

4   That may work fine out on the front steps of the courthouse

5   when the press is listening, but that is not an answer to my

6   question.

7          I gave you the opportunity to dispute the fact that

8   this sounded like a bribe, and you did not wish to answer that

9   question.

10         Go ahead and finish your argument, and then I'll let

11  the government respond.

12         MS. TAITZ:  Your Honor, just like my client, you took

13  an oath to defend the Constitution of the United States of

14  America, not an individual that happens to sit in the White

15  House but the Constitution of this country, that states the

16  person who occupies the White House in the position of

17  President and commanding chief has to be a natural-born

18  citizen.

19         The evidence that we have that, according to records,

20  Mr. Obama, in national records, has 39 different Social

21  Security numbers.  One of them that was used most commonly is a

22  Social Security number of a deceased individual.  We have

23  statements from forensic document experts showing that what

24  Mr. Obama has posted on the Internet does not represent a

25  genuine document, and the original needs to be seen.

1          So I am concerned, Your Honor, considering the fact

2     that you took an oath to protect the Constitution, how are you

3     protecting us when you are asking question after question, how

4     did you authenticate this document, but you did not concern

5     yourself with the fact that what Mr. Obama posted on the

6     Internet was never ever authenticated by anybody.  It's a jpeg,

7     it's a picture, and, according to a number of statements, has

8     numerous sense of forgery; selective service certificate,

9     according to the experts, has numerous signs of forgery.

10          And it would have been so easy to issue an order of

11    discovery and let my client go to Iraq with clear and clean

12    conscience that she is following lawful orders.

13          What is preventing you from issuing a simple order to

14    the health department in Hawaii to release hospital birth

15    certificate?  There is no information there that can be private

16    or harmful.  After all, Mr. Obama posted his birth certificate,

17    supposed birth certificate, on the Internet.  As such, the

18    issue of privacy doesn't exist, only authentication.

19          So you would attack me, saying that what I had is not

20    authentic, but yet you couldn't care less if what Mr. Obama,

21    who is in position of commander in chief, that what he posted

22    was never authenticated by anybody, specifically in light of

23    the fact that the State of Hawaii allows foreign-born children

24    of Hawaiian residents to receive Hawaiian birth certificates.

25    They allow one to get a birth certificate based on a statement

1   of one relative only, without any corroborating evidence from

2   any hospital.

3          THE COURT:  All right.  Let's narrow it back down to

4   the fact that we're in a court of law and not a political

5   debate.

6          What is the Constitutional right that you claim is

7   being violated by requiring your client to be deployed to

8   Iraq?  Not whether you think she should be under the current

9   president or not.  But what is the specific individual

10  Constitutional right of Captain Rhodes that is being violated?

11         MS. TAITZ:  Well, her life and her --

12         THE COURT:  No.  Constitutional right.

13         MS. TAITZ:  May I --

14         THE COURT:  Yes.

15         MS. TAITZ:  Your Honor, her life and her liberty can

16  be taken when she goes to Iraq following those orders.  And I

17  need, and you need, to put on the scale her rights against

18  what?  A right of Mr. Obama to take five minutes --

19         THE COURT:  What Constitutional right?

20         MS. TAITZ:  I have already stated.  She has

21  Constitutional rights for her liberty, her life.  Her life and

22  her liberty cannot be taken without proper proceedings, without

23  the proper legal proceedings.

24         THE COURT:  So is it your contention that she is

25  being denied due process under the United States Constitution

```
 1   by being forced to go to Iraq under the current commander in
 2   chief?  Is that your contention?
 3             MS. TAITZ:  Yes.
 4             THE COURT:  That's it.
 5             MS. TAITZ:  She is also denied her right under the
 6   First Amendment, her right for redress of her grievances.  On
 7   behalf of some --
 8             THE COURT:  How is she denied the right to redress
 9   her grievances under the First Amendment?
10             MS. TAITZ:  On behalf -- before Captain Rhodes came
11   to this courtroom, on behalf of some 200 members of U.S.
12   military who signed up to be plaintiffs in my legal actions, I
13   have filed proper concern with the legal counsel for Admiral
14   Mullin, Chairman of Joint Chief of Staff.
15             THE COURT:  My understanding from her testimony was
16   that she sought no redress for this grievance until you filed a
17   lawsuit on her behalf.
18             Now, tell me what it is, how she's been denied her
19   First Amendment right.
20             MS. TAITZ:  Okay.  And she -- for her to go again
21   through the chain of command, after I have already posted on
22   the Internet the letter from the legal counsel from Admiral
23   Mullin that stated that military cannot address this particular
24   grievance because commander in chief is a civilian.  So through
25   the military channels, she cannot --
```

1          THE COURT:  My understanding is that, for the

2    purposes of this particular proceeding, the government is not

3    taking the position that she was required to exhaust her

4    intraservice remedies at this particular point.  But you have

5    just indicated --

6          Is that correct, Ms. Ausprung?  You are not making

7    that specific argument in this case, are you?

8          MS. AUSPRUNG:   No, Your Honor.

9          THE COURT:  But you have said that somehow, even

10   though they are not even making that argument, that she should

11   have exhausted her remedies.  You are making an argument to me

12   that she has been denied her First Amendment right.

13         MS. TAITZ:  Yes.

14         THE COURT:  How?

15         MS. TAITZ:  Well, this is Catch 22.  On the one hand,

16   they have already stated in prior proceedings, where we were

17   here on the case of Major Cook, that the members of the

18   military needed to go through military channels.  That --

19         THE COURT:  We're talking about this case.  This

20   case -- how -- just tell me in a sentence how her First

21   Amendment right has been violated.

22         MS. TAITZ:  Let me finish that one sentence.  You are

23   not letting me finish one sentence.

24         THE COURT:  You are talking about another case.  I

25   want to talk about this case.

         1          MS. TAITZ:  Your Honor, if the military previously
         2   stated that members of the military have to go through proper
         3   military channels, and the very top of the military is saying
         4   there is nothing that we can do in military channels, she came
         5   here to the court of law.  Now the military is filing this
         6   brief, a motion to dismiss, where they are saying that the
         7   court of law cannot intervene in something that is part of the
         8   military actions, that she cannot challenge her orders because
         9   it's a purview of the military.  So we have a situation, and
        10   specifically, in regards to the commander in chief, where she
        11   is denied her First Amendment Constitutional rights, because
        12   she cannot do it through the military; and when she came here
        13   to court, the military is saying, no, no, no, wait a minute, we
        14   are going back, this is part of the military matter.
        15          THE COURT:  How do you distinguish the United States
        16   Supreme court case of Orloff versus Willoughby?
        17          MS. TAITZ:  I --
        18          THE COURT:  Are you familiar with that decision --
        19          MS. TAITZ:  I --
        20          THE COURT:  -- which indicates that federal courts
        21   should exercise great restraint in providing judicial review of
        22   decisions by the United States military?  Are you familiar with
        23   that case?
        24          MS. TAITZ:  Well, I can -- all I can state to that is
        25   that I'm familiar with another legal action called Watergate

1   and --

2               THE COURT:  No, no.  So you are not familiar with

3   Orloff versus Willoughby.  Is that correct?

4               MS. TAITZ:  It's completely --

5               THE COURT:  Either you are or you are not.  Do you

6   know that case?

7               MS. TAITZ:  Your Honor, I'm familiar with the case,

8   but it's totally irrelevant because --

9               THE COURT:  How do you distinguish that case from

10  this case?  If you are familiar with the case, tell me how you

11  distinguish it.  That's what we're doing in a court of law.

12              MS. TAITZ:  Yes.

13              THE COURT:  I'm bound to follow previous decisions of

14  the United States Supreme Court.  If you don't think they

15  apply, you need to tell me why not.

16              MS. TAITZ:  Absolutely.

17              THE COURT:  Distinguish for me Orloff versus

18  Willoughby.

19              MS. TAITZ:  Well, because, according to James --

20  Captain James Crawford, legal counsel for Chairman of Joint

21  Chief of Staff, the commander in chief is not part of the

22  military.  So each and every argument that the military brought

23  here is completely irrelevant.

24              THE COURT:  Okay.  I still haven't heard anything

25  about Orloff versus Willoughby and how it's different, but it's

1    your right not to distinguish a case if you don't want to do
2    so.
3              All right.  Ms. Ausprung, do you want to present your
4    argument?
5              MS. AUSPRUNG:  Yes, Your Honor.
6              Your Honor, I think the most striking thing about
7    Ms. Taitz's argument today is the lack of any reference to
8    Captain Rhodes in that argument.  This case is about Captain
9    Rhodes and Captain Rhodes seeking an injunction to prevent her
10   deployment to Iraq and challenging her deployment orders, not
11   these other issues.
12             Ms. Taitz did mention that we were in this courtroom
13   with a different plaintiff two months ago.  And at that time
14   the government asked you to put this matter to rest swiftly and
15   soundly, and we ask that again today.  And that's why we come
16   before you, not only seeking denial of her application for
17   temporary restraining order and preliminary injunction, but
18   also dismissal of the complaint as a whole, on multiple
19   grounds.
20             Your Honor, I think that there is a basic
21   misunderstanding here by Captain Rhodes between the lawfulness
22   of an order and the identity of the individual giving the
23   order.  And that's a fundamental misunderstanding on her part.
24   As she testified here today, pursuant to your questions, she
25   stated that her only concern was that she follow lawful

1    orders.  There has been no contention that the order that she
2    has received is unlawful in any way.  To the contrary, it is
3    quite lawful, and it is for her to deploy, just as all the
4    other service members are, as we fight wars on two fronts
5    currently.  The identity of the individual giving the order is
6    of no concern to her in this court of law, because this is no
7    different than an enlisted soldier who doesn't believe that
8    their lieutenant is qualified to be in the position he is in.
9    She has unquestionably been given a lawful order.  But beyond
10   that, there are multiple reasons why this court should not
11   entertain this matter.
12            First of all, Captain Rhodes has no likelihood of
13   success on the merits, for multiple reasons.
14            First of all, this matter is barred by res judicata
15   and collateral estoppel.
16            Just two weeks ago, Captain Rhodes attempted to do
17   this exact same thing in the District Court for the Western
18   District of Texas, where she filed an application for a
19   temporary restraining order, seeking to challenge these exact
20   same deployment orders under these exact same theories.  And
21   the Court in that case dismissed her cause of action and said
22   she had no likelihood of success on the merits, that she had
23   filed to demonstrate irreparable harm, and that an injunction
24   was not in the public interest.  Those issues have already been
25   decided by one court of competent jurisdiction.  And plaintiff

1    should not be permitted to forum-shop and go around seeking to

2    challenge these orders in any court that she can find to listen

3    to her arguments.  But even if Your Honor --

4              THE COURT:  Are you familiar -- are you familiar with

5    any case filed by Ms. Taitz on behalf of persons contesting the

6    legitimacy of military orders based upon the President's birth

7    place -- are you familiar with any of those actions where the

8    government has been required to even respond to any discovery?

9    In other words, are you familiar with any of those actions that

10   have made it beyond the motion to dismiss stage?

11             MS. AUSPRUNG:   No, Your Honor.

12             THE COURT:  You may continue.

13             MS. AUSPRUNG:  Your Honor, even -- I think what Your

14   Honor is going to is, for res judicata purposes, there needs to

15   be a final judgment on the merits.  But we contend that this is

16   barred by collateral estoppel as well, that the issues have

17   been decided.  The issues of particular identity --

18             THE COURT:  Didn't the -- the court in Texas seemed

19   to summarily dismiss it, but the judge there was directly

20   addressing the temporary restraining order requirements and

21   found that those had not been met, and that was the essence of

22   that ruling.  And then apparently the judge went on to dismiss

23   it because, in making that ruling, the Court had found that

24   there was no likelihood of success on the merits.  But a fair

25   reading of that order is that the primary ruling was based upon

1    the plaintiff not being entitled to a temporary restraining

2    order.  Do you agree with that?

3              MS. AUSPRUNG:  Yes, Your Honor.  That is correct.

4              THE COURT:  So, I mean, that's not as clear a case of

5    res judicata as if you had a case that went all the way to a

6    decision on the merits.

7              MS. AUSPRUNG:  Yes, Your Honor.  And --

8              THE COURT:  So let's get away from res judicata and

9    collateral estoppel and focus on why this entire action should

10   be dismissed on the merits.

11             MS. AUSPRUNG:  Yes, Your Honor.  And that's the next

12   reason why this should be dismissed at this point, is it

13   presents nonjusticiable political questions.  The claims that

14   Captain Rhodes is bringing are at the very heart of the

15   political question doctrine.

16             THE COURT:  Do you read the political question

17   doctrine, as you are seeking to have it applied here, the same

18   as the doctrine that's set out in cases like Orloff versus

19   Willoughby, that caution the district courts to abstain from

20   interfering in military matters unless it is clear that the

21   challenged action is being done with no authority?

22             MS. AUSPRUNG:  No, Your Honor.

23             THE COURT:  Are those two different doctrines the way

24   you view them, or are you including that within the political

25   question doctrine as you argue it in your brief?

 1          MS. AUSPRUNG:  Your Honor, we view them as two
 2    separate doctrines that both caution this court against
 3    entertaining this matter.
 4          THE COURT:  And your brief did not focus much on the
 5    abstention doctrine.  Why is that?
 6          MS. AUSPRUNG:  On the abstention doctrine, Your
 7    Honor?
 8          THE COURT:  The Orloff line of cases, that there was
 9    not much focus on that in your brief, is because did you not
10    feel you have had the time to do that in the short period of
11    time that you had to brief the issue, or you don't feel that
12    that line of cases is applicable?
13          MS. AUSPRUNG:  Your Honor, they are absolutely
14    applicable; and if there wasn't sufficient briefing on that,
15    then we would like to clarify that now.
16          We certainly believe that there is ample grounds for
17    judicial restraint under those scenarios.
18          THE COURT:  The concern I have is that if I accepted
19    your argument with regard to the political question doctrine,
20    that would mean, under no circumstances, could a court ever
21    interfere in a decision questioning the legal authority of the
22    commander in chief, under any circumstances.  And that may be
23    your argument, that that is always a political question.  But
24    even if there was a case presented that the commander in chief
25    was clearly not authorized to be President of the United

```
 1   States, then no judicial officer would be authorized to
 2   intervene in that action; whereas I understand it, under the
 3   abstention doctrine, under Orloff versus Willoughby, that means
 4   that you have got to look at each particular case and determine
 5   whether the factors are such that you should abstain from
 6   ruling in that particular case under these particular facts.
 7           Do you agree with that distinction?
 8           MS. AUSPRUNG:  I agree with that distinction, Your
 9   Honor.
10           THE COURT:  All right.  And it's your position that
11   the abstention under Orloff versus Willoughby and the other
12   cases applies equally here as does the political question
13   doctrine.
14           MS. AUSPRUNG:  Absolutely, Your Honor, equally.
15           THE COURT:  Are you familiar with the Mindes decision
16   in the Eleventh Circuit, the M-i-n-d-e-s decision?
17           MS. AUSPRUNG:  Yes, Your Honor.
18           THE COURT:  Do you think that applies here?
19           MS. AUSPRUNG:  Absolutely, Your Honor.
20           THE COURT:  Was that included in your brief?
21           MS. AUSPRUNG:  No, it was not, Your Honor.
22           THE COURT:  Isn't it right on point with this
23   situation, except that it dealt with exhaustion of intraservice
24   remedies; but as far as the Mindes factors, would they not
25   apply here?
```

1          MS. AUSPRUNG:  They do apply, Your Honor, as to the

2    justiciability.  However, in cases in which there is no

3    contention of nonexhaustive administrative remedies, that

4    hasn't been the way that we have been typically arguing it.

5    But certainly, Your Honor, we think that Mindes is applicable,

6    and the Eleventh Circuit has reaffirmed the applicability of

7    Mindes as early as 2003 in Wink versus England.

8          THE COURT:  Now, the Wink case involved intraservice

9    remedies.

10          MS. AUSPRUNG:  Yes, Your Honor.

11          THE COURT:  But Mindes was broad enough to apply in

12    the context where there was an exhaustion of administrative

13    intraservice remedies; correct?

14          MS. AUSPRUNG:  Yes, Your Honor.

15          THE COURT:  And they said that under that situation,

16    you look at these four factors, and you should only intervene

17    with judicial review of military decisions if those factors

18    weigh in favor of intervention; correct?

19          MS. AUSPRUNG:  Yes, Your Honor.

20          THE COURT:  Why would that not apply directly in this

21    case, that analysis?

22          MS. AUSPRUNG:  It does directly apply, Your Honor.

23          THE COURT:  Why did you not brief it?

24          MS. AUSPRUNG:  Your Honor, we were under a very short

25    time constraint.

1          THE COURT:  Candor is always important.  I appreciate

2    that.

3          Ms. Taitz.

4          MS. TAITZ:  I would like to --

5          THE COURT:  Have you read the Mindes decision?

6          Just please answer that question.  Have you read the

7    Mindes case in the Eleventh Circuit?

8          MS. TAITZ:  I read it.  And --

9          THE COURT:  What is your understanding of the holding

10   of that decision?

11         MS. TAITZ:  It is my understanding that at this time

12   this would be the time that intervention would be warranted,

13   because, first, the issue at hand is an issue of paramount

14   importance for the whole county --

15         THE COURT:  What are the four factors under Mindes?

16         MS. TAITZ:  From what I recall, one of the factors

17   dealt with exhaustion of remedies.  And on behalf --

18         THE COURT:  No.  Assuming that administrative

19   remedies have been exhausted, what are the four factors that

20   the Eleventh Circuit has said this court should consider in

21   determining whether there shall be judicial review of a

22   military order?

23         If you don't know, just tell me you don't know.

24         MS. TAITZ:  Your Honor, from what I remember the

25   holding, it provides for basically a balancing act, whether

1   intervention will be warranted or not.  And in general, it

2   deals with the importance of the issue; it deals with the --

3   provided that, indeed, the administrative remedy was exhausted;

4   and whether there is justiciability.  And I would like to --

5           THE COURT:  Captain -- I mean Major -- do you know

6   the four factors from Mindes?

7           MS. AUSPRUNG:  Your Honor, my understanding of the

8   factors are that there must be an allegation of a deprivation

9   of a Constitutional -- or an allegation of a Constitutional

10  right or an allegation that the military has acted in violation

11  of its own applicable statutes -- a deprivation of a

12  Constitutional right or an allegation the military has acted in

13  violation of its own applicable statutes or regulations and

14  exhaustion of available intraservice corrective measures.

15          THE COURT:  Is it your understanding under Mindes

16  that the Court preliminarily must evaluate the nature of the

17  claim so that the Court can give weight to that in weighing

18  whether or not the intervention in military affairs is

19  warranted?

20          MS. AUSPRUNG:  Yes, Your Honor.

21          THE COURT:  All right.  You may complete your

22  argument, Major, and then I'm going to allow Ms. Taitz one last

23  chance to respond in rebuttal.

24          MS. AUSPRUNG:  Your Honor, I think that the

25  application of those factors in this case and the line of

1   questioning that you previously asked of the plaintiff
2   demonstrates that this is clearly a nonjusticiable military
3   decision.  When you asked what was the Constitutional right
4   that Captain Rhodes is being denied, she has not made any
5   showing that she would be denied any Constitutional right by
6   compliance with her orders.  Her own statements and her own
7   testimony belie that claim, where she said that she has no
8   objection to military service in general; she has no objection
9   to deployment if it were a different commander in chief.  And I
10   think that this goes back to the heart of the issue of is she
11   confusing the lawfulness of the order with the identity of the
12   individual giving the order.  And she -- there's no allegation
13   this is an unlawful order to deploy.  In fact, she said she
14   would comply with the order if it had come from President
15   Bush.  But it is not her position to judge the qualifications
16   of the individual giving the order.  Therefore, she can't make
17   any straight-faced argument that she would be deprived of a
18   Constitutional right by complying with orders in accordance
19   with the military service that she states that she has no
20   problem with, the contract that she says that she will fulfill,
21   and the deployment that she was fully aware of when she signed
22   up for military service, and the orders that she has been
23   following since January of 2009, even deploying -- or being
24   relocated to Fort Sam Houston, Texas.  She doesn't have any
25   objection to military service, only military service in Iraq.

1          THE COURT:  What is your understanding of what her

2    duties will be upon being deployed?  She'll be deployed to a

3    hospital there that would be taking care of soldiers that are

4    injured or ill?

5          MS. AUSPRUNG:  As far as I'm aware, Your Honor, she

6    will be providing medical services as a doctor to sick and

7    injured soldiers.

8          THE COURT:  And if she weren't required to go, there

9    would have to be some other doctor sent in her place, I take

10   it.

11         MS. AUSPRUNG:  Absolutely, Your Honor.

12         THE COURT:  Or, I take it, she's probably being sent

13   there to relieve some other doctor that's likely been there for

14   months.

15         MS. AUSPRUNG:  Undoubtedly, sir.

16         THE COURT:  And that doctor's leave would be delayed

17   if she were not required to go, I assume.  Is that --

18         MS. AUSPRUNG:  It would probably take some time for

19   the Army to find a replacement for Captain Rhodes were she not

20   to go.

21         THE COURT:  And what is your understanding of when

22   she would likely leave Fort Benning if the Court does not grant

23   the temporary restraining order?

24         MS. AUSPRUNG:  She will be leaving in approximately a

25   week, Your Honor.

1          THE COURT:  Is there any chance that she will leave

2    before Wednesday at noon?

3          MS. AUSPRUNG:  Unlikely, Your Honor.

4          THE COURT:  All right.  Ms. Taitz, you may wrap up

5    with any rebuttal that you have.

6          Let me just -- if I haven't already made it clear, I

7    know you think that I'm attacking you in some way.  But I don't

8    know how they do litigation in California.  It may be the judge

9    just sits here and stares and lets lawyers talk.  But you'll

10   find from lawyers that appear in my court, I'm a fairly active

11   participant in the proceedings and --

12         MS. TAITZ:  May I respond?

13         THE COURT:  No, no.  -- and I ask questions.  And

14   simply because I may ask one side more questions than the other

15   that are more pointed does not mean that that necessarily is

16   the direction that I am leaning.  But I will tell you that what

17   I focus on is the law and these case decisions that are binding

18   on me.  And you'll be far more effective if you cite to me

19   legal precedent rather than arguments that are more political

20   based than they are legal based.  So --

21         MS. TAITZ:  May I respond?

22         THE COURT:  I'm going to give you a chance to give

23   rebuttal.  I'm just trying to tell you, to be helpful to you,

24   that your rebuttal will be more effective with me if you will

25   make it in a way that analyzes legal cases and legal precedent

1    in support of your argument.  But go ahead.

2             MS. TAITZ:  Well, Your Honor, my concern is that it

3    shows bias when you are asking me how was the -- Mr. Obama's

4    hospital birth certificate authenticated, the one that was

5    received from Kenya, and yet you did not ask those three

6    attorneys, how in the world did they authenticate Mr. Obama's

7    birth certificate from United States.

8             First of all, he has never shown one.  He did not

9    show one from any hospital in the United States.

10            So what exactly did those three attorneys

11   authenticate?  You did not find it necessary to ask them this

12   question.

13            THE COURT:  Let me -- I'm not going to respond to

14   everything that you have to say.  But this is just so

15   fundamental that I'm having a hard time understanding how you

16   are not grasping it.

17            Who has the burden of proof in a legal proceeding for

18   a temporary restraining order?  What is your understanding of

19   that legal rule?

20            MS. TAITZ:  Well, yes.

21            THE COURT:  Who has that burden?

22            MS. TAITZ:  The moving party.

23            THE COURT:  Under the law, who has the burden of

24   showing that there is a substantial likelihood that you will be

25   able to prove the denial of a Constitutional right?  Who has

1  that burden?  You or government?

2           MS. TAITZ:  I do.

3           THE COURT:  Who has the burden of establishing that

4  the President of the United States is not eligible to hold that

5  office?  Who has that burden in a legal proceeding for a

6  temporary restraining order?  Who has that burden?  You or the

7  government?

8           MS. TAITZ:  Well, I have --

9           THE COURT:  Who has it?

10          MS. TAITZ:  I have this burden.  However --

11          THE COURT:  All right.  That -- I'm going let you

12  complete your argument.  But that is the reason that I asked

13  you these questions, because you have that burden, and I am

14  attempting to elicit from you how you have carried that

15  burden.  And the response I get from you is not, Here is

16  evidence that allows me to carry this burden; but the response

17  I get is, Your Honor, you should shift that burden to the

18  government to prove that he is the legitimate commander in

19  chief.

20          Now, that may be a good argument politically.  That

21  may be an argument that you can take to the Congress in an

22  attempt to impeach the president because he's not the commander

23  in chief, as you allege.  But that is not the burden in a legal

24  judicial proceeding.  You have that burden.  That's why I have

25  asked you those questions.  It wasn't to pick on you or be

1  mean.  It was simply to clarify in my mind whether there was
2  any other evidence that you wanted to present to carry that
3  burden.  That's the only reason I asked those questions.
4          But you may go ahead, and I'll give you five minutes
5  to make a rebuttal argument, uninterrupted.
6          MS. TAITZ:  I would be able to meet my burden more
7  fully if I can get from Your Honor an order, a judicial
8  subpoena, an order for discovery, and which would give me an
9  opportunity to more fully meet such burden, because, otherwise,
10  no citizen of the United States of America is able to meet such
11  a stringent burden.  We can go only by the circumstantial
12  evidence, because the government is not doing its job.  It was
13  their responsibility to make sure that we don't have a usurper
14  sitting in the White House and as the commander in chief.  They
15  did not meet their burden to check proper documentation.  And
16  that's why people like Connie Rhodes and others are rising and
17  will be in your courtroom day after day after day after day.
18  So instead of having multiplicity of lawsuits, and in the
19  interest of judicial economy, and in order not to have this
20  resentment that is now very clear in the military -- and not
21  military.  Just this Saturday, according to the police, four
22  and a half million people gathered.
23          And, by the way, in regards to the proceedings, what
24  I have been showing -- the order from Judge Carter in
25  California, that stated that the date was set for trial, and

1    order where Judge Carter, in my proceedings in California, the

2    Court encourages the parties to begin discovery before the

3    scheduling conference.  That drew more cheers than anything or

4    anybody else.  The citizens of this country want the answers.

5    The Department of Justice has failed them, failed to do proper

6    background check.  The military has failed them, failed to do

7    proper background check.  We have a situation where Ms. Rhodes

8    is saying that she will be denied her Constitutional rights,

9    her life and liberty can be taken by the orders of a usurper,

10   somebody who is not legitimate in his position.

11           Now, in regards to Mindes, you have mentioned -- and

12   we talked about several prongs.  One of them, it's where the

13   government and the military use its own regulations.  The

14   problem is that, in regards to the commander in chief, right

15   now we do not have any regulations.  And for that reason alone,

16   where there is no way of redress, where there is no

17   intergovernmental or interservice regulation or reprieve, there

18   is a need to get regulation.  It is a case of first

19   impression.  It never happened in the history of this county.

20   And that's why we do need a mechanism from you, Your Honor.

21           We have asked for a jury trial.  We do need the jury

22   to -- she is entitled.  It's her Constitutional right to have

23   her case be heard by the jury of her peers, on the merits.

24           The government is saying that they want you to sweep

25   it under the rug swiftly.  Well they didn't say "sweep it under

1   the rug," but decide it swiftly on the merits.  We haven't
2   heard anything on the merits.  And it was specifically us that
3   each and every issue to be heard by the jury of her peers.

4         So I don't believe that this is the case where the
5   government can just throw away the case swiftly because it's
6   inconvenient.  She has a right to see the jury of her peers who
7   would hear the case on the merits.

8         We have the case of first impression.  Right now
9   there is no regulation where -- that would affect the commander
10  in chief to -- that would provide any proof that the commander
11  in chief is indeed legitimate.

12        She took an oath.  She has a right to make sure that
13  she is following lawful orders, that she is true to her oath
14  to -- her oath to protect the Constitution.  We have this
15  system of checks and balances.

16        Your Honor, I was born and raised in Russia, where I
17  had relatives that were sent to Siberia to labor camps, when
18  the military, just like this three people, wanted to move
19  swiftly; and they sent those people to Siberia for 10 years.

20        Your Honor, my three children are named after
21  relatives that were killed during World War II, when officers,
22  just like Ms. Rhodes or other officers, were just blindly
23  following the orders, where three of my relatives, who were
24  three children, young children, were told to dig a grave, and
25  those officers just emptied their revolvers and threw them in

1    the grave, and they were not questioning the orders.

2          We don't want this country become like Stalinist

3    Russia or Nazi Germany, where the military is just asking to

4    swiftly do away with Constitutional rights of the citizens.

5          We have high likelihood of success on the merits,

6    because nobody has ever seen any vital records, any

7    authenticated vital records of Mr. Obama.  Nobody in this whole

8    country.  So far, what we have seen were statements from the

9    experts saying that there are signs of forgery and documents

10   from Kenya.

11         I have already provided the request for schedule of

12   depositions in the case where I'm representing 48 plaintiffs in

13   California.  By October 17th, Mr. Obama and Mr. Gates are

14   supposed to appear in depositions with proper documents.

15         So what I am asking from you, Your Honor, is just

16   give my client a reprieve of 60 days.  Within 60 days, we

17   should have proper information.

18         So instead of coming here time after time after time,

19   why not resolve this issue once and for all.  If they want to

20   resolve it swiftly, we will have an opportunity to do so, where

21   we can provide the results of the deposition and documents

22   obtained in those depositions in the case currently in

23   California.  We can provide it in this court.

24         THE COURT:  I have given you fifteen instead of

25   five.  Go ahead and wrap up.

1           MS. TAITZ:  Thank you, Your Honor.

2           THE COURT:  All right.  I'm going to issue a written

3    order in this case analyzing the issues and addressing the

4    issues that are raised by the motion for TRO and the motion to

5    dismiss.  I will have that order completed no later than

6    Wednesday at noon.  I don't know if I'll have it completed

7    tomorrow or not, but it will be completed no later than

8    Wednesday at noon.

9           Ms. Ausprung, if there's any suggestion that she is

10   going to be deployed prior to that time, I'm asking you to

11   inform the Court.  I would like to make my ruling, regardless

12   of what it is, prior to her being deployed.

13          MS. AUSPRUNG:  Yes, Your Honor.

14          THE COURT:  That order will obviously be docketed in

15   the normal and ordinary course of our business, and we will

16   also post it on our court Website in case there's any interest

17   beyond the parties as to exactly how the Court may rule on this

18   matter.

19          Is there anything else we need to take up today from

20   the plaintiff?

21          MS. TAITZ:   No, Your Honor.

22          THE COURT:  From the defendants?

23          MS. AUSPRUNG:   No, Your Honor.

24          THE COURT:  Ms. Taitz, have you filed your

25   application to practice in this court pro hac vice yet?

1    MS. TAITZ:  Oh, I have one more form that I need to

2  give to them, yes.

3    THE COURT:  You understand I have been somewhat

4  flexible in allowing you to appear here pro hac vice, but we do

5  expect lawyers practicing in our court to follow our rules, so

6  make sure you take care of that before you leave today.

7    MS. TAITZ:  Of course, Your Honor.

8    THE COURT:  All right.  We are adjourned.

9    (Proceedings Concluded)

10                    CERTIFICATE OF REPORTER

11          I, Betsy J. Peterson, Official Court Reporter of
   the United States District Court, in and for the Middle
12 District of the State of Georgia, Columbus Division, a
   Registered Professional Reporter, do hereby CERTIFY that the
13 foregoing proceedings were reported by me in stenographic
   shorthand and were thereafter transcribed under my direction
14 into typewriting; that the foregoing is a full, complete, and
   true record of said proceedings.

15

16                    This 2nd day of October, 2009.

17

18

19                    _____
                       S/Betsy J. Peterson, RPR,CCR
20                     Federal Official Court Reporter

21

22

23

24

25