RECEIVED
CLERK'S OFFICE
09 OCT 23  AM 2: 35
LOCKART... ...
MIDDLE DIST. OF GEORGIA
COLUMBUS, GEORGIA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION
-----------------------------------------------------X
CONNIE RHODES,

                              *Plaintiff*,                    **4:09-CV-106 (CDL)**

        -against-

THOMAS D. MACDONALD, Colonel,
Garrison Commander, Fort
Benning; *et al.*,                                           **Hon. Clay D. Land, USDJ**
                              *Defendants*.
-----------------------------------------------------X


# AMICUS BRIEF IN OPPOSITION

### to the "the [Court's] intended purpose" of "directing the financial penalty to the National Infantry Foundation at Ft. Benning, Georgia

Victor M. Serby, *amicus curie*
255 Hewlett Neck Road
Woodmere, NY 11598 10118
Tel: (516) 374-2455
Email: serbyv@bellatlantic.net

## **AMICUS BRIEF IN OPPOSITION**

I came across this Court's Order because it made national news. *See* http://www.abajournal.com/news/lawyer_fined_20k_for_wild_accusations_in_suit_questioning _obamas_citizenshi/. I felt compelled to comment on portions of the Order appearing on page 42.

This Brief is directed to the following portions of the Court's Order, docket entry #28, filed and entered on 10/13/09 which state:

> Counsel Orly Taitz is hereby ordered to pay $20,000.00 to the United States, through the Middle District of Georgia Clerk's Office, within thirty days of the date of this Order as a sanction for her misconduct in violation of Rule 11 of the Federal Rules of Civil Procedure.[11]

> [11] The Court wishes to explore the possibility of directing the financial penalty to the National Infantry Foundation at Ft. Benning, Georgia, which has as part of its mission the recognition of our brave soldiers who do their duty regardless of the personal sacrifice required and their own personal political beliefs. The Assistant U.S. Attorney shall file within thirty days of today's Order a short brief outlining the position of the United States as to whether such a monetary sanction can be used for this intended purpose. The Court emphasizes that the Court is ordering the penalty be paid to the United States as required under Rule 11 and not to a third party, but the Court seeks to determine whether the Court is authorized to subsequently order that the proceeds be paid by the United States to the Foundation.

### THE COURT'S "INTENDED PURPOSE," IS UNCONSTITUTIONAL AND GREATLY BEYOND ITS AUTHORIZED JUDICIAL POWER

"The [Court's] intended purpose" of "directing the financial penalty to the National Infantry Foundation at Ft. Benning, Georgia, which has as part of its mission the recognition of our brave soldiers who do their duty regardless of the personal sacrifice required and their own personal political beliefs," is a gross unconstitutional exercise of the Court's power, and would in fact be a federal crime under 31 U.S.C. §§ 1341, 1350 punishable by fine and imprisonment.

The Court correctly states that it is "ordering **the penalty be paid to the United States** as required under Rule 11 and not to a third party." (emphasis added). Upon payment (subject to final disposition on appeal, if any), the money belongs to the United States and must go into The United States Treasury.

Just as the legislative branch may not interfere with the finality of judgments Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995), the Judicial branch may not tread on the constitutional powers given exclusively to Congress. The Supreme Court's decision in Office

of Personnel Management v. Richmond, 496 U.S. 414, 424-430 (1990) is instructive, and conclusively answers the District Court's present inquiry as to whether it is authorized to subsequently order that the proceeds of its sanction be paid by the United States to the Foundation. The cited portion of OPM is reproduced below:

> The Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, provides' that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." For the particular type of claim at issue here, a claim for money from the Federal Treasury, the Clause provides an explicit rule of decision. Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute. All parties here agree that the award respondent seeks would be in direct contravention of the federal statute upon which his ultimate claim to the funds must rest, 5 U.S.C. § 8337. The point is made clearer when the appropriation supporting the benefits sought by respondent is examined. In the same subchapter of the United States Code as the eligibility requirements, Congress established the Civil Service Retirement and Disability Fund. 5 U.S.C. § 8348. That section states in pertinent part: "The Fund . . . is appropriated for the payment of . . . benefits *as provided by* this subchapter . . ." (emphasis added). The benefits respondent claims were not "provided by" the relevant provision of the subchapter; rather, they were specifically denied. It follows that Congress has appropriated no money for the payment of the benefits respondent seeks, and the Constitution prohibits that any money "be drawn from the Treasury" to pay them.

> Our cases underscore the straightforward and explicit command of the Appropriations Clause. "It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Cincinnati Soap Co. v. United States,* 301 U. S. 308, 301 U. S. 321 (1937) (citing *52 U. S. 291 (1851))*. *In* Reeside, supra,@ we addressed a claim brought by the holder of a judgment of indebtedness against the United States that the Secretary of

> Page 496 U. S. 425

> the Treasury of the United States should be ordered to enter the claim upon the books of the Treasury so that the debt might be paid. In rejecting the petitioner's claim for relief, we stated as an alternative ground for decision that, if "the petition in this case was allowed so far as to order the verdict against the United States to be entered on the books of the Treasury Department, the plaintiff would be as far from having a claim on the Secretary or Treasurer to pay it as now. The difficulty in the way is the want of any appropriation by Congress to pay this claim. It is a well-known constitutional provision that no money can be taken or drawn from the Treasury except under an appropriation by Congress. *See* Constitution, art. 1, § 9 (1 Stat. at Large, 15)."

"However much money may be in the Treasury at any one time, not a dollar of it can be used in payment of anything not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion." *Id.* at 52 U. S. 291.

The command of the Clause is not limited to the relief available in a judicial proceeding seeking payment of public funds. Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury. We have held, for example, that while the President's pardon power may remove all disabilities from one convicted of treason, that power does not extend to an order to repay from the Treasury the proceeds derived from the sale of the convict's forfeited property:

"So, also, if the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress. Moneys once in the treasury can only be withdrawn by an appropriation by law. However large, therefore,

Page 496 U. S. 426

may be the power of pardon possessed by the President, and however extended may be its application, there is this limit to it, as there is to all his powers -- it cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress."

*Knote v. United States,* 95 U. S. 149, 95 U. S. 154 (1877). Just as the pardon power cannot override the command of the Appropriations Clause, so too judicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized. *See INS v. Pangilinan,* 486 U. S. 875 486 U. S. 883 (1988) ("*Courts of equity can no more disregard statutory and constitutional requirements than can courts of law*").

We have not had occasion in past cases presenting claims of estoppel against the Government to discuss the Appropriations Clause, for reasons that are apparent. Given the strict rule against estoppel applied as early as 1813 in @ 11 U. S. 423-424, we decline today to accept the Solicitor General's argument for an across-the-board no-estoppel rule. But this makes it all the more important to state the law and to settle the matter of estoppel as a basis for money claims against the Government.

Our decision is consistent with both the holdings and the rationale expressed in our estoppel precedents. Even our recent cases evince a most strict approach to estoppel claims involving public funds. *See Community Health Services,* 467 U.S. at 467 U. S. 63 ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law"). The course of our jurisprudence shows why: Opinions have differed on whether this Court has ever accepted an estoppel claim in other contexts, *see id.*

Page 496 U. S. 427

at 467 U. S. 60 (suggesting that *United States v. Pennsylvania Industrial Chemical Corp.,* 411 U. S. 655 (1973) (*PICCO*) was decided on estoppel grounds); *id.,* 467 U.S. at 467 U. S. 68 (opinion of REHNQUIST, J.) (*PICCO* not an estoppel case), but not a single case has upheld an estoppel claim against the Government for the payment of money. And our cases denying estoppel are animated by the same concerns that prompted the Framers to include the Appropriations Clause in the Constitution. As Justice Story described the Clause,

"The object is apparent upon the slightest examination. It is to secure regularity, punctuality, and fidelity in the disbursements of the public money. As all the taxes raised from the people, as well as revenues arising from other sources, are to be applied to the discharge of the expenses, and debts, and other engagements of the government, it is highly proper that congress should possess the power to decide how and when any money should be applied for these purposes. If it were otherwise, the executive would possess an unbounded power over the public purse of the nation, and might apply all its moneyed resources at his pleasure. The power to control and direct the appropriations constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation. . . ."

2 J. Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858).

The obvious practical consideration cited by Justice Story for adherence to the requirement of the Clause is the necessity, existing now as much as at the time the Constitution was ratified, of preventing fraud and corruption. We have long ago accepted this ground as a reason that claims for estoppel cannot be entertained where public money is at stake, refusing to "introduce a rule against an abuse, of which, by improper collusions, it would be very difficult for the public to protect itself." *Lee,* 7 Cranch at 11 U. S. 370. But the Clause has a more fundamental and comprehensive purpose, of direct relevance

Page 496 U. S. 428

to the case before us. It is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good, and not according to the individual favor of Government agents or the individual pleas of litigants.

Extended to its logical conclusion, operation of estoppel against the Government in the context of payment of money from the Treasury could in fact render the Appropriations Clause a nullity. If agents of the Executive were able, by their unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds, the control over public funds that the Clause reposes in Congress in effect could be transferred to the Executive. If, for example, the President or Executive Branch officials were displeased with a new restriction on benefits imposed by Congress to ease burdens on the fisc (such as the

restriction imposed by the statutory change in this case) and sought to evade them, agency officials could advise citizens that the restrictions were inapplicable. Estoppel would give this advice the practical force of law, in violation of the Constitution.

It may be argued that a rule against estoppel could have the opposite result, that the Executive might frustrate congressional intent to appropriate benefits by instructing its agents to give claimants erroneous advice that would deprive them of the benefits. But Congress may always exercise its power to expand recoveries for those who rely on mistaken advice should it choose to do so. In numerous other contexts where Congress has been concerned at the possibility of significant detrimental reliance on the erroneous advice of Government agents, it has provided appropriate legislative relief. *See, e.g.,* Federal Election Campaign Act of 1971, 2 U.S.C. §§ 437f and 438(e); Federal Trade Commission Act, 15 U.S.C. § 57b-4; Securities Act of 1933, 15 U.S.C. § 77s(a); Truth in Lending Act, 15 U.S.C. § 1640(f); Portal-to-Portal Act of 1947, 29 U.S.C. § 259; Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1028; Technical

Page 496 U. S. 429

and Miscellaneous Revenue Act of 1988, Pub.L. 100-647, § 8018, 102 Stat. 3794.

One example is of particular relevance. In *Schweiker v. Hansen,* 450 U. S. 785 (1981), we rejected an estoppel claim made by a Social Security claimant who failed to file a timely written application for benefits as required by the relevant statute. Congress then addressed such situations in the Budget Reconciliation Act of 1989 by providing that, for claims to old age, survivors, and disability insurance, and for supplemental security income,

"In any case in which it is determined to the satisfaction of the Secretary that an individual failed as of any date to apply for monthly insurance benefits under this title by reason of misinformation provided to such individual by any officer or employee of the Social Security Administration relating to such individual's eligibility for benefits under this title, such individual shall be deemed to have applied for such benefits on the later of [the date on which the misinformation was given or the date upon which the applicant became eligible for benefits apart from the application requirement]."

Pub.L. 101-239, § 10302, 103 Stat. 2481. The equities are the same whether executive officials' erroneous advice has the effect of frustrating congressional intent to withhold funds or to pay them. In the absence of estoppel for money claims, Congress has ready means to see that payments are made to those who rely on erroneous Government advice. Judicial adoption of estoppel based on agency misinformation would, on the other hand, vest authority in these agents that Congress would be powerless to constrain.

The provisions of the Federal Torts Claims Act (FICA), 28 U.S.C. §§ 1346(b), 2671 *et seq.,* also provide a strong indication of Congress' general approach to claims based on

governmental misconduct, and suggest that it has considered and rejected the possibility of an additional exercise of its appropriation power to fund claims similar to those advanced here.

Page 496 U. S. 430

The FTCA provides authorization in certain circumstances for suits by citizens against the Federal Government for torts committed by Government agents. Yet the FTCA by its terms excludes both negligent and intentional misrepresentation claims from its coverage. *See* 28 U.S.C. § 2680(h). The claim brought by respondent is in practical effect one for misrepresentation, despite the application of the "estoppel" label. We would be most hesitant to create a judicial doctrine of estoppel that would nullify a congressional decision against authorization of the same class of claims.

Indeed, it would be most anomalous for a judicial order to require a Government official, such as the officers of petitioner OPM, to make an extrastatutory payment of federal funds. It is a federal crime, punishable by fine and imprisonment, for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress. *See* 31 U.S.C. §§ 1341, 1350. If an executive officer on his own initiative had decided that, in fairness, respondent should receive benefits despite the statutory bar, the official would risk prosecution. That respondent now seeks a court order to effect the same result serves to highlight the weakness and novelty of his claim.

The whole history and practice with respect to claims against the United States reveals the impossibility of an estoppel claim for money in violation of a statute. Congress' early practice was to adjudicate each individual money claim against the United States, on the ground that the Appropriations Clause forbade even a delegation of individual adjudicatory functions where payment of funds from the treasury was involved. *See* W. Cowen, P. Nichols, & M. Bennett, The United States Court of Claims, A History, 216 Ct.Cl. 1, 5 (1978). As the business of the federal legislature has grown, Congress has placed the individual adjudication of claims based on the Constitution, statutes, or contracts, or on specific authorizations of suit against the Government, with the Judiciary. *See, e.g.,* the Tucker Act, 28 U.S.C. .... [*See* the opinion if you want to read more].

THE COURT IS ASKED TO READ AND CONSIDER THE
FOLLOWING EXCERPT FROM THE LIFE OF COLONEL
DAVID CROCKET—THE "NOT YOURS TO GIVE SPEECH"

Col. Davy Crockett
1884
From *The Life of Colonel David Crockett*
Member of the U.S. Congress 1827-31 & 1832-35
Compiled from *The Life of Colonel David Crockett*
by Edward S. Ellis (Philadelphia: Porter & Coates, 1884) *in the public domain*

### Speech before the House of Representatives

#### *by David (Davy) Crockett*

#### Not Yours to Give

One day in the House of Representatives, a bill was taken up appropriating money for the benefit of a widow of a distinguished naval officer. Several beautiful speeches had been made in its support. The Speaker was just about to put the question when Mr. Crockett arose:

"Mr. Speaker --- I have as much respect for the memory of the deceased, and as much sympathy for the suffering of the living, if suffering there be, as any man in this house, but we must not permit our respect for the dead or our sympathy for a part of the living to lead us into an act of injustice to the balance of the living. I will not go into an argument to prove that Congress has no power to appropriate this money as an act of charity. Every member upon this floor knows it. We have the right, as individuals, to give away as much of our own money as we please in charity; but as members of Congress we have no right so to appropriate a dollar of the public money. Some eloquent appeals have been made to us upon the ground that it is a debt due the deceased. Mr. Speaker, the deceased lived long after the close of the war; he was in office to the day of his death, and I have never heard that the government was in arrears to him.

"Every man in this House knows it is not a debt. We cannot, without the grossest corruption, appropriate this money as the payment of a debt. We have not the semblance of authority to appropriate it as a charity. Mr. Speaker, I have said we have the right to give as much money of our own as we please. I am the poorest man on this floor. I cannot vote for this bill, but I will give one week's pay to the object, and, if every member of Congress will do the same, it will amount to more than the bill asks.

"He took his seat. Nobody replied. The bill was put upon its passage, and, instead of passing unanimously, as was generally supposed, and as, no doubt, it would, but for that speech, it received but few votes, and of course, was lost.

"Later, when asked by a friend why he had opposed the appropriation, Crockett gave this explanation:
"Several years ago I was one evening standing on the steps of the Capitol with some other members of Congress, when our attention was attracted by a great light over in Georgetown. It was evidently a large fire. We jumped into a hack and drove over as fast as we could. In spite of all that could be done, many houses were burned and many families made homeless, and, besides, some of them had lost all but the clothes they had on. The weather was very cold, and when I saw so many women and children suffering, I felt that something ought to be one for them. The next morning a bill was introduced appropriating $20,000 for their relief. We put aside all other business and rushed it through as soon as it could be done.

"The next summer, when it began to be time to think about the election, I concluded I would take a scout around among the boys of my district. I had no opposition there, but, as the election was some time off, I did not know what might turn up. When riding one day in a part of my district in which I was more a stranger than any other, I saw a man in a field plowing and coming toward the road. I gauged my gait so that we should meet as he came to the fence. As he came up, I spoke to the man. He replied politely, but, as I thought, rather coldly.

"I began: 'Well, friend, I am one of those unfortunate beings called candidates, and--'" 'Yes, I know you; you are Colonel Crockett. I have seen you once before, and voted for you the last time you were elected. I suppose you are out electioneering now, but you had better not waste your time or mine. I shall not vote for you again.'

"This was a sockdolager... I begged him to tell me what was the matter." 'Well, Colonel, it is hardly worth-while to waste time or words upon it. I do not see how it can be mended, but you gave a vote last winter which shows that either you have not capacity to understand the Constitution, or that you are wanting in the honesty and firmness to be guided by it. In either case you are not the man to represent me. But I beg your pardon for expressing it in that way. I did not intend to avail myself of the privilege of the constituent to speak plainly to a candidate for the purpose of insulting or wounding you. I intended by it only to say that your understanding of the Constitution is very different from mine; and I will say to you what, but for my rudeness, I should not have said, that I believe you to be honest....But an understanding of the Constitution different from mine I cannot overlook, because the Constitution, to be worth anything, must be held sacred, and rigidly observed in all its provisions. The man who wields power and misinterprets it is the more dangerous the more honest he is.'

"I admit the truth of all you say, but there must be some mistake about it, for I do not remember that I gave any vote last winter upon any Constitutional question." 'No, Colonel, there's no mistake. Though I live here in the backwoods and seldom go from home, I take the papers from Washington and read very carefully all the proceedings in Congress. My papers say that last winter you voted for a bill to appropriate $20,000 to some suffers by a fire in Georgetown. Is that true?'

"Well, my friend, I may as well own up. You have got me there. But certainly nobody will complain that a great and rich country like ours should give the insignificant sum of $20,000 to relieve its suffering women and children, particularly with a full and overflowing Treasury, and I am sure, if you had been there, you would have done just as I did.'" 'It is not the amount, Colonel, that I complain of; it is the principle. In the first place, the government ought to have in the Treasury no more than enough for its legitimate purposes. But that has nothing to do with the question. The power of collecting and disbursing money at pleasure is the most dangerous power that can be intrusted to man, particularly under our system of collecting revenue by tariff, which reaches every man in the country, no matter how poor he may be, and the poorer he is the more he pays in proportion to his means. What is worse, it presses upon him without his knowledge where the weight centers, for there is not a man in the United States who can ever guess how much he pays to the government. So you see, that while you are contributing to relieve one, you are drawing it from thousands who are even worse off than he. If you had the right to give anything, the amount was simply a matter of discretion with you, and you had as much right to give $20,000,000 as $20,000. If you have the right to give to one, you have the right to give to all; and, as the Constitution neither defines charity nor stipulates the amount, you are at liberty to give to any thing and everything which you may believe, or profess to believe, is a charity, and to any amount you may think proper. You will very easily perceive what a wide door this would open for fraud and corruption and favoritism, on the one hand, and for robbing the people on the other. No, Colonel, Congress has no right to give charity. Individual members may give as much of their own money as they please, but they have no right to touch a dollar of the public money for that purpose. If twice as many houses had been burned in this county as in Georgetown, neither you nor any other member of Congress would have thought of appropriating a dollar for our relief. There are

about two hundred and forty members of Congress. If they had shown their sympathy for the suffers by contributing each one week's pay, it would have made over $13,000. There are plenty of men in and around Washington who could have given $20,000 without depriving themselves of even a luxury of life. The congressmen chose to keep their own money, which, if reports be true, some of them spend not very creditable; and the people about Washington, no doubt, applauded you for relieving them from the necessity of giving by giving what was not yours to give. The people have delegated to Congress, by the Constitu- tion, the power to do certain things. To do these, it is authorized to collect and pay moneys, and for nothing else. Everything beyond this is usurpation, and a violation of the Constitution. So you see, Colonel, you have violated the Constitution in what I consider a vital point. It is a precedent fraught with danger to the country, for when Congress once begins to stretch it's power beyond the limits of the Constitution, there is no limit to it, and no security for the people. I have no doubt you acted honestly, but that does not make it any better, except as far as you are personally concerned, and you see that I cannot vote for you..'

"I tell you I felt streaked. I saw if I should have opposition, and this man should go to talking, he would set others to talking, and in that district I was a gone fawn-skin. I could not answer him, for the fact is, I was so fully convinced that he was right, I did not want to. But I must satisfy him, and I said to him: Well, my friend, you hit the nail upon the head when you said I did not have sense enough to understand the Constitution. I intended to be guided by it, and thought I had studied it fully. I have heard many speeches in Congress about the powers of Congress, but what you have said here at your plow has got more hard, sound sense in it than all the fine speeches I ever heard. If I had ever taken the view of it that you have, I would have put my head into the fire before I would have given that vote; and if I ever vote for another unconstitutional law I wish I may be shot.

"He laughingly replied: 'Yes Colonel, you have sworn to that once before, but I will trust you again upon one condition. You say that you are convinced that your vote was wrong. Your acknowledgment of it will do more good than beating you for it. If, as you go around this district, you will tell people about this vote, and that you are satisfied that it was wrong, I will not only vote for you, but will do what I can to keep down opposition, and perhaps, I may exert a little influence in that way.'

"If I don't [said I] I wish I may be shot; and to convince you that I am earnest in what I say I will come back this way in a week or ten days, and if you will get up a gathering of the people, I will make a speech to them. Get up a barbecue, and I will pay for it.

" 'No, Colonel, we are not rich people in this section, but we have plenty of provisions to contribute to a barbecue, and some to spare for those who have none. The push of crops will be over in a few days, and we can then afford a day for a barbecue. This is Thursday; I will see to getting up on Saturday week.. Come to my house on Friday, and we will go together, and I promise you a very respectable crowd to see and hear you.'

"Well, I will be here. but one thing more before I say good-bye. I must know your name.

" 'My name is Bunce.'

"Not Horatio Bunce?

" 'Yes.'

"Well, Mr. Bunce, I never saw you before though you say you have seen me, but I know you very well. I am glad I have met you, and very proud that I may hope to have you for my friend.

"It was one of the luckiest hits of my life that I met him. He mingled but little with the public, but was widely known for his remarkable intelligence and incorruptible integrity, and for a heart brimful and running over with kindness and benevolence, which showed themselves not only in words but in acts. He was the oracle of the whole country around him, and his fame had extended far beyond the circle of his immediate acquaintance. Though I had never met him before, I had heard much of him, and but for this meeting it is very likely I should have had opposition, and had been beaten. One thing is very certain, no man could now stand up in that district under such a vote.

"At the appointed time I was at his house, having told our conversation to every crowd I had met, and to every man I stayed all night with, and I found that it gave the people an interest and a confidence in me stronger than I had ever seen manifested before. Though I was

considerably fatigued when I reached his house, and, under ordinary circumstances, should have gone early to bed, I kept up until midnight, talking about the principles and affairs of government, and got more real, true knowledge of them than I had got all my life before. I have known and seen much of him since, for I respect him --- no, that is not the word --- I reverence and love him more than any living man, and I go to see him two or three times a year; and I will tell you sir, if everyone who professes to be a Christian, lived and acted and enjoyed it as he does, the religion of Christ would take the world by storm.

"But to return to my story. The next morning we went to the barbecue, and, to my surprise, found about a thousand men there. I met a good many whom I had not known before, and they and my friend introduced me around until I had got pretty well acquainted --- at least, they all knew me. In due time notice was given that I would speak to them. They gathered up around a stand that had been erected. I opened my speech by saying:

"Fellow-citizens --- I present myself before you today feeling like a new man. My eyes have lately been opened to truths which ignorance or prejudice, or both, had heretofore hidden from my view. I feel that I can today offer you the ability to render you more valuable service than I have ever been able to render before. I am here today more for the purpose of acknowledging my error than to seek your votes. That I should make this acknowledgment is due to myself as well as to you. Whether you will vote for me is a matter for your consideration only.

"I went on to tell them about the fire and my vote for the appropriation and then told them why I was satisfied it was wrong. I closed by saying:

"And now, fellow-citizens, it remains only for me to tell you that the most of the speech you have listened to with so much interest was simply a repetition of the arguments by which your neighbor, Mr. Bunce, convinced me of my error.

"It is the best speech I ever made in my life, but he is entitled to the credit for it. And now I hope he is satisfied with his convert and that he will get up here and tell you so.

"He came upon the stand and said: " 'Fellow-citizens --- It affords me great pleasure to comply with the request of Colonel Crockett. I have always considered him a thoroughly honest man, and I am satisfied that he will faithfully perform all that he has promised you today.'

"He went down, and there went up from that crowd such a shout for Davy Crockett as his name never called forth before.

"I am not much given to tears, but I was taken with a choking then and felt some big drops rolling down my cheeks. And I tell you now that the remembrance of those few words spoken by such a man, and the honest, hearty shout they produced, is worth more to me than all the reputation I have ever made, or shall ever make, as a member of Congress.

"Now, sir," concluded Crockett, "you know why I made that speech yesterday. There is one thing now to which I wish to call to your attention. You remember that I proposed to give a week's pay. There are in that House many very wealthy men --- men who think nothing of spending a week's pay, or a dozen of them, for a dinner or a wine party when they have something to accomplish by it. Some of those same men made beautiful speeches upon the great debt of gratitude which the country owed the deceased --- a debt which could not be paid by money --- and the insignificance and worthlessness of money, particularly so insignificance a sum as $10,000, when weighed against the honor of the nation. Yet not one of them responded to my proposition. Money with them is nothing but trash when it is come out of the people. But it is the one great thing for which most of them are striving, and many of them sacrifice honor, integrity, and justice to obtain it."

David Crockett was born August 17, 1786 at Limestone (Greene County), Tennessee. He died March 06, 1836 as one of the brave Southerners defending the Alamo.
Crockett had settled in Franklin County, Tennessee in 1811. He served in the Creek War under Andrew Jackson. In 1821 and 1823 he was elected to the Tennessee legislature. In 1826 and 1828 he was elected to Congress. He was defeated in 1830 for his outspoken opposition to President Jackson's Indian Bill - but was elected again in 1832.

In Washington, although his eccentricities of dress and manner excited comment, he was always popular on account of his shrewd common sense and homely wit; although generally

favoring Jackson's policy, he was entirely independent and refused to vote to please any party leader.

At the end of the congressional term, he joined the Texans in the war against Mexico, and in 1836 was one of the roughly 180 men who died defending the Alamo. Tradition has it that Crockett was one of only six survivors after the Mexicans took the fort, and that he and the others were taken out and executed by firing squad.

WHEREFORE, for the above reasons, VICTOR M. SERBY, *amicus curiae*, requests that this Court abandon its intention to order that the proceeds of the sanction in this case be paid by the United States to the National Infantry Foundation at Ft. Benning, Georgia, no matter how worthy its mission.

Dated: October 17, 2009

_____
Victor M. Serby, *amicus curiae*
255 Hewlett Neck Road
Woodmere, NY 11598-1452
Tel: (516) 374-2455
Email: serbyv@bellatlantic.net

## CERTIFACATE OF SERVICE

On October 17, 2009, I served the enclosed **NOTICE OF MOTION TO FILE A BRIEF** *AMICUS CURIAE*, and **AMICUS BRIEF IN OPPOSITION** to the "the [Court's] intended **purpose" of "directing the financial penalty to the National Infantry Foundation at Ft. Benning, Georgia** on the following persons:

| | |
|---|---|
| **Orly Taitz**<br>Law Offices Of Orly Taitz Esq.<br>26302 La Paz Ste 211<br>Mission Viego, CA 92691<br>949–683–5411<br>Email: dr_taitz@yahoo.com | **Rebecca Elaine Ausprung**<br>U.S. Army Litigation Division<br>901 N STUART ST STE 400<br>ARLINGTON , VA 22203<br>703–696–1614<br>Fax: 703–696–8126<br>Email: rebecca.ausprung@us.army.mil |
| **Sheetul S. Wall**<br>U.S. Attorney's Office<br>P.O. Box 2568<br>Columbus , GA 31902–2568<br>706–649–7700<br>Fax: 706–649–7667<br>Email: Sheetul.S.Wall@usdoj.gov | |

by e-mail as an attachment in PDF format to their respective ECF-designated e-mail addresses appearing on the docket sheet as stated above.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2009

Victor M. Serby